**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JEANINE M. RAQUET,

          Plaintiff,

          v.

THE ALLSTATE CORPORATION,

          Defendant.

Case No. 18-cv-2347

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeanine Raquet sues Defendant The Allstate Corporation pursuant to this Court's diversity jurisdiction, alleging various violations of Illinois law. Plaintiff, a former senior vice president at the Defendant insurance company, claims Defendant unlawfully divested her of various stock options and denied her a year-end bonus when she left the company and assumed a new position at a different company. Defendant moves for summary judgment on all four counts of Plaintiff's third amended complaint. [160]. For the reasons explained below, this Court grants Defendant's motion.

## I.    Plaintiff's Motions to Strike and Local Rule 56.1

As a preliminary matter, Plaintiff moves to strike Defendant's statement of facts, arguing that it fails to comply with the local rules in various ways. [185] at 1–3. This Court maintains broad discretion to enforce the local rules governing summary judgment motions, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371,

382 n.2 (7th Cir. 2008), and addresses Plaintiff's motion before turning to the facts of the case.

Plaintiff first argues that Defendant failed to meet and confer before filing its statement of facts, requiring her "to expend substantial time and resources disputing same." [185] at 1. This argument lacks merit because, even though motions must be predicated with a meet-and-confer, neither Local Rule 56.1 nor this Court's own standing order demands that the parties confer before a party moving for summary judgment files its statement of facts. And expending time and resources is, of course, a consequence of Plaintiff filing a lawsuit and seeing it through to the summary judgment stage.

Plaintiff next complains that, when Defendant attached deposition transcripts as exhibits to its statement of facts, it failed to also attach exhibits to those transcripts. *Id.* at 1. Again, however, Plaintiff fails to point to any rule demanding such compliance, and thus, this argument fails as well.

Plaintiff also contends that, although Defendant filed a statement containing 59 separately-numbered facts, it nonetheless exceeded Local Rule 56.1's 80-fact limit because each paragraph "consist[s] of multiple alleged statements of facts bundled together." *Id.* at 2. But Local Rule 56.1(a) requires only that Defendant's statement "consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Nothing in Rule 56.1 instructs parties to include only one fact per paragraph. And while some of Defendant's

paragraphs contain multiple facts, such facts "are logically grouped and the combinations make sense in context." *Maher v. Rowen Grp., Inc.*, No. 12 C 7169, 2015 WL 273315, at *7 (N.D. Ill. Jan. 20, 2015); *see, e.g.*, [163] at ¶¶ 26, 27.

Plaintiff also argues that Defendant's statement "consist[s] of narratives," "are argumentative, which makes them disputed," "assert . . . incorrect conclusions," "are questions of fact, "include incorrect facts," and "allege facts without reference to supporting materials." [185] at 2. This Court disagrees and finds that Defendant's statement comprises factual assertions set forth without argument and supported by record cites. Further, to the extent Plaintiff believes Defendant's facts are incorrect or that the record cites do not support an assertion of fact, it remains, of course, her prerogative to highlight those deficiencies in her response brief. In any case, these alleged failures provide no basis to strike Defendant's statement. *See Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 677 (N.D. Ill. 2017) (in the interests of justice and efficiency, courts may exercise their discretion "in the direction of leniency" and consider statements and responses that "arguably" satisfy the rules).

Finally, Plaintiff moves to strike Defendant's responses to her Local Rule 56.1(b)(3)(C) statement of additional facts on the basis that some or all of Defendant's responses[1] constitute purely argumentative, unsupported denials. [209]. This Court has reviewed Defendant's responses, and once again disagrees with Plaintiff, as

---

[1] Plaintiff does not clearly set forth which responses she moves to strike. At one point in her brief, Plaintiff moves to strike Defendant's responses in their entirety, [209] at 1, while at another, she lists only certain facts she argues this Court should strike, *id.* at 19–20.

Defendant's responses are neither argumentative nor unsupported by record citations.

Now having addressed Plaintiff's arguments, this Court notes that if any party has flouted the Local Rules governing summary judgment, it is Plaintiff, whose Local Rule 56.1(b)(3) responses to Defendant's statement of facts "are uniformly improper and intended to complicate rather than simplify the court's task." *Portis v. City of Chicago*, 510 F. Supp. 2d 461, 463–64 (N.D. Ill. 2007).

Just to provide one example, Defendant asserts in one paragraph that "Allstate sells personal lines insurance products, including homeowners insurance and automobile insurance, through exclusive independent agents located in communities nationwide." [163] at ¶ 24. In response, Plaintiff should simply state that she does not dispute this fact, or alternatively, that she does dispute the fact and cite to supporting materials. She does neither, instead writing that she "disputes the significance, relevancy and materiality" of this statement "since at the time of her retirement she was the [Senior Vice President] of the Field Business Conduct Division and did not sell or service personal lines insurance products and there is no overlap between her job duties than and in her current AAA position." [185] at ¶ 24.

This response is deficient in two respects. First, it unhelpfully fails to controvert Defendant's fact, as required under Local Rule 56.1. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Second, Plaintiff improperly introduces a new additional fact. *De v. City of Chicago*, 912 F. Supp. 2d 709, 715 (N.D. Ill. 2012) ("the nonmoving party's additional facts belong in a *separate* statement"). Under these

4

circumstances, this Court exercises its discretion to: (1) deem Defendant's fact admitted; and (2) disregard Plaintiff's additional factual assertion. *Smith*, 321 F.3d at 683; *Portis*, 510 F. Supp. 2d at 465; *De*, 912 F. Supp. 2d at 714–15. Many of Plaintiff's other responses—or portions of those responses—suffer from the same deficiencies. *E.g.*, [185] at ¶¶ 6, 7, 18, 25, 29, 34, 37, 39. This Court disregards any additional facts improperly introduced in Plaintiff's responses, and also deems admitted any of Defendant's facts that Plaintiff fails to properly controvert.

## II. Background

### A. Plaintiff's Employment With Defendant

This Court now turns to the facts of this case, which it takes from Defendant's statement of undisputed facts [163], Plaintiff's responses to Defendant's statement of undisputed facts [185], Plaintiff's statement of additional facts [189], and Defendant's responses to Plaintiff's statement of additional facts [200].

Defendant, a publicly held personal lines property and casualty insurer, sells its insurance products throughout the United States. [163] at ¶ 1. Defendant's sales of personal lines products—including homeowners insurance, automobile insurance, boat insurance, personal umbrella insurance, and renters insurance—accounts for a substantial majority of Defendant's revenue. *Id.* at ¶¶ 26, 27. Defendant's top selling product remains automobile insurance. *Id.* at ¶ 27. Defendant maintains a number of business units, including "personal lines," "emerging businesses," and "Allstate Investments," each of which offers its own products and services, and is organized under its own leaders. *Id.* at ¶ 25.

Plaintiff worked for Defendant from 1985 until 2016. *Id.* at ¶ 2. Between 2009 and 2013, Plaintiff served as Vice President of Agency Operations, and then as Senior Vice President of Agency Operations between 2013 and September 2016. *Id.* at ¶ 28. In September 2016, Defendant promoted Plaintiff to the position of Senior Vice President, Field Business Conduct Officer—a position she held until she left the company three months later. *Id.* In this last role, Plaintiff reported directly to Kathy Mabe, who reported directly to Matt Winter. *Id.* at ¶¶ 28, 48; [163-20] at 3. Between 2012 and 2018, Matt Winter served as the leader of personal lines, reporting directly to the company's CEO. [163] at ¶ 26; [163-1] at 18–19.

Defendant maintains that, at all relevant times, Plaintiff worked in Defendant's personal lines division. [163] at ¶ 28. Consistent with this assertion, Plaintiff testified she based her own interpretation of the term "division" upon reporting structures, and ultimately the "leader" of the reporting structure. [163-1] at 19 ("I defined [division] more based on probably leader."). Plaintiff confirmed through her testimony that she ultimately reported to Winter. *Id.*

Notwithstanding, Plaintiff asserts that personal lines does not exist as a "division" because Defendant does not refer to it as such in its own annual meetings and SEC filings. [185] at ¶ 28. She asserts instead that the term "personal lines" refers only to lines of insurance Defendant sells, and that more than twenty "divisions" exist within personal lines, including the "Field Business Conduct division" to which she belonged. *Id.* at ¶ 27. Plaintiff cites the testimony of Harriet Harty, a former HR executive for the company, who stated that the "major divisions"

within the company included personal lines, life, HR, finance, legal, and technology, [163-3] at 26, and that personal lines was further "divided into . . . other areas" such as "Field Business Conduct," *id.* at 31. Defendant's internal organizational charts for 2016 also depict "Field Business Conduct" as an area within personal lines. [189] at ¶¶ 25–26; [200] at ¶¶ 25–26.

According to Plaintiff, her work for the "Field Business Conduct" unit did not involve selling any insurance products. [185] at ¶¶ 27, 40.

### B. Plaintiff Leaves For AAA

Since January 19, 2017, Plaintiff has worked for AAA in Dearborn, Michigan, serving as the Executive Vice President, Insurance Operations & Distribution. [163] at ¶ 34. Her transition from Defendant to AAA traces back to September 2016, when Plaintiff interviewed and discussed potential employment with AAA in Dearborn, Michigan. *Id.* at ¶ 44. One month later, in October 2016, Plaintiff received a formal job offer from AAA; and in November 2016, Plaintiff accepted that offer. *Id.* at ¶¶ 45–46.

On December 13, 2016, Plaintiff met with Mabe and told her she was "retiring" from the company effective December 31, 2016. *Id.* at ¶ 48. Plaintiff did not tell Defendant that she had accepted a position at AAA at the time, and in fact, did not inform Defendant of this fact until mid-January 2017. *Id.* at ¶ 50; [163-1] at 30.

AAA, like Allstate, sells personal lines property and casualty insurance as well as roadside assistance services throughout the United States. [163] at ¶ 33. In Michigan specifically, where AAA is headquartered, AAA and Allstate compete for market share in sales of automobile insurance. *Id.* at ¶ 37; [185] at ¶ 37.

7

### C.      Plaintiff's Participation in the EIP

Since 2001, Defendant has sponsored the "Allstate Corporation 2001 Equity Incentive Plan" (EIP or the Plan), which Defendant has renamed and amended from time to time. [163] at ¶¶ 4, 6. Under the EIP, certain employees, like Plaintiff, could receive stock option awards at Defendant's discretion. *Id.* at ¶ 4. The EIP does not require that Defendant notify participants of amendments unless the revisions adversely impact a participant's outstanding awards, in which case Defendant must obtain a participant's consent. [163] at ¶ 6; [185] at ¶ 6. Indeed, each version of the EIP has contained the following provision:

### Article 15.  Amendment, Modification and Termination

The Board may, at any time and from time to time, alter, amend, suspend or terminate the Plan in whole or in part, provided that no amendment shall be made which shall increase the total number of shares of Stock that may be issued under the Plan, materially modify the requirements for participation in the Plan, or materially increase the benefits accruing to Participants under the Plan, in each case unless such amendment is approved by the stockholders of the Company.

No termination, amendment, or modification of the Plan shall adversely affect in any material way any Award previously granted under the Plan, without the written consent of the Participant holding such Award, unless such termination, modification or amendment is required by applicable law and except as otherwise provided herein.

[163-7] at 26; [163-8] at 20; [163-10] at 20.

Plaintiff received a number of awards pursuant to the EIP during her employment with Defendant. [163] at ¶ 16. Each award is reflected in an award agreement, which expressly states that the award is "SUBJECT TO FORFEITURE AS PROVIDED IN THIS . . . AWARD AGREEMENT AND THE PLAN." *Id.* at ¶ 14. Each award agreement also states that an award is "deemed accepted if the

8

participant does not decline this Award by accessing the Fidelity [the Plan administrator] NetBenefits website." [185] at ¶ 16. Plaintiff accepted each of her awards, either by going to Fidelity's website to affirmatively accept them, or by automatically receiving them by not accessing Fidelity's website to decline them. *Id.*

Effective February 1, 2012, Defendant amended the EIP to include a two-year non-competition provision (the Forfeiture Provision) applying prospectively to all awards granted after February 21, 2012. [163] at ¶ 7. The Forfeiture Provision states specifically:

> 17.3 Non-Competition. Any Participant who has received an Award under the Plan on or after February 21, 2012, . . . shall not, for the two-year period following Termination of Employment, directly or indirectly engage in, own or control an interest in or act as principal, director, officer, or employee of, or consultant to, any firm or company that is a Competitive Business. 'Competitive Business' is defined as a business that designs, develops, markets, or sells a product, product line, or service that competes with any product, product line, or service of the division in which Participant works. This section is not meant to prevent Participant from earning a living, but rather to protect the Company's legitimate business interests. A Participant is not subject to this non-competition provision if: (i) employed in any jurisdiction where the applicable law prohibits such non-competition provision.

> ***

> If a Participant violates the non-competition provision set forth above, the Board or a committee thereof may, to the extent permitted by applicable law, cancel or cause to be cancelled any or all of the Participant's outstanding Awards granted on or after February 21, 2012, that remain subject to a Period of Restriction or other performance or vesting condition as of the date on which the Participant first violated the non-competition provision.

[163-8] at 23–24. On March 12, 2012, Defendant emailed all Plan participants to inform them of the amendment, stating in pertinent part: "The second change relates to the inclusion of a 24 month post-retirement non-compete provision. All unvested

9

equity at the time of retirement may be forfeited for violation of the non-compete." [163] at ¶ 10; [163-13] at 13. Plaintiff received this email. [163] at ¶¶ 10, 11.

On May 21, 2013, Defendant amended the EIP again, this time reducing the non-competition period from two years to one year for any awards issued after May 21, 2013. *Id.* at ¶ 8; [163-10] at 23.

Under Article 3.2 of the EIP, Defendant's Compensation and Succession Committee retained authority to award, modify, or cancel awards, and could also delegate such responsibilities to other employees. [163-7] at 8–10; [163-8] at 8–9; [163-10] at 8. In 2013, the Committee delegated such authority to the "senior most officer with responsibility for the human resource function at [the company]." [163-11] at 6; [163-3] at 16. As of February 2017, that officer was Harty, who served as Defendant's head of HR. [163] at ¶ 55; [163-3] at 13.

On February 10, 2017, after learning that Plaintiff left the company for AAA, Harty canceled Plaintiff's outstanding, unvested awards granted on or after February 21, 2012. [163] at ¶ 56. In a letter dated that same day, Harty wrote to Plaintiff that "your employment with a competitor of [Defendant], AAA . . . violates the terms of The Allstate Corporation 2013 Equity Incentive Plan (the 'Plan') awards referenced below." [163-19] at 2.

### D.    The AIP

Defendant also maintains an Annual Incentive Plan (AIP) pursuant to which eligible employees may receive annual cash incentive bonuses. [163] at ¶ 17. Defendant pays out these bonuses in the March following a particular performance year. *Id.* at ¶ 23.

Defendant provided AIP-eligible employees, including Plaintiff, a guide setting forth the terms of the AIP. *Id.* at ¶ 18. The AIP guide provides: "All awards, including pro-rata eligibility, are distributed on a discretionary basis," and "[n]o one, regardless of eligibility, is guaranteed an award." *Id.* The AIP also provides: "Allstate reserves the right to make adjustments and can, at its discretion, reduce or eliminate individual awards." *Id.* The AIP further states that it "creates no contract, implied or otherwise between you, Allstate Insurance Company, and any of its affiliates. The final decision as to whether an award is paid to an eligible participant is solely at the discretion of Allstate." *Id.* at ¶ 19.

In early January 2017, Mabe recommended that Plaintiff receive an AIP bonus for 2016 notwithstanding her retirement. *Id.* at ¶ 57. But after Defendant became aware that Plaintiff was working for AAA, Defendant's CEO and EVP of Human Resources rejected the recommendation and declined to award Plaintiff an AIP bonus for 2016. *Id.* at ¶ 59.

## III. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

11

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia, Illinois*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## IV. Analysis

Defendant moves for summary judgment on all four counts of Plaintiff's third amended complaint. [160]. This Court considers each count in order below.

### A. Count I: Breach of Contract (Award Agreements Under EIP)

In Count I, Plaintiff alleges that Defendant's cancelation of Plaintiff's unvested 2012 through 2016 awards amounted to a breach of the EIP. [140] at ¶¶ 133–58. Specifically, Plaintiff claims that the Forfeiture Provision is unenforceable, and thus Defendant breached by canceling the awards based upon that provision. *Id.* Alternatively, Plaintiff asserts that, even if the Forfeiture Provision is enforceable, Plaintiff did not violate it by working for AAA, and therefore Defendant breached by improperly relying upon that provision. *Id.*

### 1.      Governing Law

As a threshold matter, this Court determines which state's law applies to Plaintiff's claim for breach of the EIP.   Federal courts sitting in diversity apply the choice-of-law rules of the forum state—here, Illinois.   *W. Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 223 (7th Cir. 2017).   Under Illinois law, courts engage in a choice-of-law analysis only where a difference between Illinois law and the law of another state "will make a difference in the outcome."   *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831 (7th Cir. 2019) (quoting *W. Side Salvage*, 878 F.3d at 223).   A party seeking a choice-of-law determination must identify the existence of an outcome-determinative conflict; in the absence of such proffer, this Court applies the law of the forum state.   *Id.*

Neither party here identifies an outcome-determinative conflict.   Plaintiff alleges in her third amended complaint that Illinois law applies to interpreting the Forfeiture Provision, [140] at ¶ 132, but cites to both Illinois and Delaware law in her brief, apparently conceding that no outcome-determinative conflict exists between Delaware and Illinois law on this issue.   [187] at 3–9.   Defendant also concedes that the choice between Illinois and Delaware law does not affect the outcome.   [198] at 8.   Because neither party has identified the existence of an outcome-determinative conflict between Illinois and Delaware law, this Court applies the laws of Illinois.   *See Bd. of Forensic*, 922 F.3d 827; *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010) (applying forum law where no party raised a conflict of law issue).

13

### 2. Validity of the Forfeiture Provision

Plaintiff's primary theory for relief in Count I rests upon the proposition that the Forfeiture Provision is invalid, and thus Defendant breached the EIP by relying upon it in canceling Plaintiff's awards. [187] at 3–13. As detailed below, Plaintiff advances several arguments in support of that theory, but none is persuasive.

### a. Unreasonable Restraint on Competition

First, Plaintiff contends that the Forfeiture Provision constitutes an unreasonable restraint on competition. *Id.* at 7–9. The Forfeiture Provision states:

> 17.3 Non-Competition. Any Participant who has received an Award under the Plan on or after February 21, 2012, . . . shall not, for the two-year period following Termination of Employment, directly or indirectly engage in, own or control an interest in or act as principal, director, officer, or employee of, or consultant to, any firm or company that is a Competitive Business. 'Competitive Business' is defined as a business that designs, develops, markets, or sells a product, product line, or service that competes with any product, product line, or service of the division in which Participant works. This section is not meant to prevent Participant from earning a living, but rather to protect the Company's legitimate business interests. A Participant is not subject to this non-competition provision if: (i) employed in any jurisdiction where the applicable law prohibits such non-competition provision.
>
> ***
>
> If a Participant violates the non-competition provision set forth above, the Board or a committee thereof may, to the extent permitted by applicable law, cancel or cause to be cancelled any or all of the Participant's outstanding Awards granted on or after February 21, 2012, that remain subject to a Period of Restriction or other performance or vesting condition as of the date on which the Participant first violated the non-competition provision.

[163-8] at 23–24.

Under Illinois law, courts enforce non-competition clauses so long as they are reasonable. *Tatom v. Ameritech Corp.*, 305 F.3d 737, 745 (7th Cir. 2002); *Advent*

14

*Elecs., Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997). In *Tatom*, the Seventh

Circuit considered the enforceability of a forfeiture provision that stated:

> [If the participant] has, without the consent of the Company or any
> subsidiary, become associated with, is employed by, renders services to,
> or owns a substantial interest in any business that is competitive with
> the Company or its subsidiaries,
> . . . .
>
> then, his participation in the Plan shall immediately cease and all
> undistributed awards and grants previously made to him under the Plan
> and all rights to payments of any kind under the Plan, exclusive of any
> amount voluntarily deferred shall be immediately forfeited.

305 F.3d at 740. When the *Tatom* plaintiff left his company to work for a competitor,

the company invoked this provision, canceling his vested and unvested stock options.

*Id.* at 741. The Seventh Circuit affirmed the district court's grant of summary

judgment in favor of the company on the plaintiff's breach of contract claim,

concluding that a "provision that calls for the forfeiture of a bonus in the form of stock

options does not strike us as an unreasonable restraint on competition." *Id.* at 745–

46. The court reasoned:

> Stock options, in contrast to other types of regular and bonus
> compensation, give an employee the right to acquire an ownership
> interest in a company; that interest in turn gives the employee a long-
> term stake in the company and supplies him an incentive to contribute
> to the company's performance. A provision calling for the forfeiture of
> such options in the event that the holder goes to work for a competitor
> thus serves to keep the option holder's interests aligned with the
> company's.

*Id.* at 745 (internal citations omitted). The court also noted the distinction in case

law between non-compete provisions that prevent an employee from working for a

competitor (which might be illegal) and those that merely result in the forfeiture of

15

certain benefits should an employee work for a competitor (which are legal). *Id.* at 744.

*Tatom* controls here. Like the provision in that case, the Forfeiture Provision here simply divests employees from stock options if they do, in fact, compete. And unlike traditional non-competes that the Seventh Circuit cautioned might constitute illegal restraints, this one neither threatens the loss of regular or bonus compensation nor prevents Plaintiff from competing. This Court thus finds the Forfeiture Clause enforceable as a matter of law. *See Tatom,* 305 F.3d at 745; *see also Viad Corp v. Houghton*, No. 08-CV-6706, 2010 WL 748089, at *7 (N.D. Ill. Feb. 26, 2010) (forfeiture clause enforceable because employee "was able to go into competition despite the clause, and the effect of the clause did not impoverish" the employee).

### b.    Notice and Consent

Next, Plaintiff argues that the Forfeiture Provision is invalid because Defendant neither provided her notice nor obtained her written consent before including it in the 2012 EIP. [187] at 6. This Court rejects this argument, too.

By its plain terms, and as the parties agree, the EIP does not require that Defendant notify participants of amendments unless the revisions adversely impact a participant's *outstanding* awards, in which case Defendant must obtain a participant's consent. [163] at ¶ 6; [185] at ¶ 6. Here, though, the 2012 EIP amendment applied only to awards issued after its effective date of February 21, 2012; it did not impact any outstanding awards already issued. [163] at ¶ 7. Defendant thus possessed no contractual obligation to provide notice or obtain

16

consent from Plaintiff before including the Forfeiture Provision in the 2012 EIP amendment. And indeed, after Plaintiff started working for AAA, Defendant canceled only those awards issued to Plaintiff *after* February 21, 2012. *Id.* at ¶ 56.

And in any case, despite not having any contractual obligation to do so, Defendant did email Plaintiff (along with other EIP participants) to notify them of the amendment; this email, dated March 12, 2012, informed Plaintiff that the Plan had been amended to include "a 24 month post-retirement non-compete provision" and that "unvested equity at the time of retirement may be forfeited for violation of the non-compete." [163] at ¶¶ 10, 11; [163-13] at 13. Defendant's actions in this regard further undermine Plaintiff's suggestion that she lacked notice of the Forfeiture Provision.

Nor does Plaintiff support her argument that Defendant failed to obtain shareholder approval before amending the EIP. *Contra* [187] at 6. The EIP requires stockholder approval only where an amendment increases the total number of shares issued under the EIP, materially modifies requirements for participation in the EIP, or materially increases the benefits accruing to participants. [163-7] at 26; [163-8] at 20; [163-10] at 20. The Forfeiture Provision does none of these things, so Defendant possessed no contractual obligation to obtain shareholder approval before including it in the 2012 EIP amendment.

### c. Acceptance and Consideration

Plaintiff also claims that the Forfeiture Provision is invalid because Defendant failed to obtain Plaintiff's acceptance and additional consideration as to the 2012 EIP

17

amendment containing the Forfeiture Provision. [187] at 3–5. A valid contract amendment under Illinois law requires mutual assent and consideration. *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill. 2006); *Urban Sites of Chicago, LLC v. Crown Castle USA*, 979 N.E.2d 480, 492 (Ill. App. Ct. 2012). Both elements exist here.

As the undisputed evidence shows, each award to which Plaintiff asserts entitlement is reflected in an award agreement expressly stating that the award was "SUBJECT TO FORFEITURE AS PROVIDED IN THIS . . . AWARD AGREEMENT AND THE PLAN." [163] at ¶ 14. Each award agreement also stated that the award is "deemed accepted if the participant does not decline this Award by accessing the Fidelity NetBenefits website." [185] at ¶ 16. Plaintiff concedes, as she must, that she accepted each of her awards either by going to Fidelity's website to affirmatively accept them, or by automatically receiving them by not declining them. *Id.* Thus, because each of the award agreements incorporated the terms of the EIP (including the Forfeiture Provision), Plaintiff accepted the Forfeiture Provision when she accepted each of the awards. *See 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) ("When the contract incorporates a specific document by name, both parties are on notice and are bound by the terms of that document."); *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 713 (7th Cir. 2019) (under Illinois law, a party to a contract may, by her acts and conduct, indicate her assent to its terms and become bound by its provisions even though she has not signed it).

The 2012 EIP amendment is also supported by additional consideration. Illinois law characterizes consideration as "some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 563–64 (7th Cir. 2012) (quoting *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 679 n.9 (7th Cir. 2005)). Clearly, under the 2012 EIP amendment, Plaintiff received benefits in the form of additional awards, and Defendant suffered detriment by giving away those awards to Plaintiff. [185] ¶ 16. Plaintiff's arguments otherwise are wholly unconvincing.

### d. Harty's Authorization

Plaintiff next contends that Harty lacked authorization to cancel Plaintiff's awards. [187] at 7. Plaintiff failed to fully develop this argument, *see id.*, but it lacks merit anyway. Under Article 3.2 of the EIP, Defendant's Compensation and Succession Committee retained authority to award, modify, or cancel awards, and could also delegate such responsibilities to other employees. [163-7] at 8–10; [163-8] at 8–9; [163-10] at 8. In 2013, the Committee delegated such authority to the "senior most officer with responsibility for the human resource function at [the company]." [163-11] at 6; [163-3] at 16. As of February 2017, Harty served as Defendant's head of HR. [163-3] at 13; [163] at ¶ 55. Harty thus possessed authorization to cancel Plaintiff's awards.

### 3. Plaintiff Works for a Competitive Business

Having rejected Plaintiff's arguments that the Forfeiture Provision is unenforceable, this Court next considers whether Defendant properly invoked it after

learning that Plaintiff works for AAA. The parties' dispute here centers around whether AAA "designs, develops, markets, or sells a product . . . that competes with any product . . . of the division" in which Plaintiff worked, in which case AAA constitutes a "competitive business" triggering the application of the Forfeiture Provision. [163-8] at 23. Because the EIP does not define the term "division," the parties argue extensively about the relevant "division" in which Plaintiff worked. Defendant says Plaintiff worked in the personal lines division, which sells products that competes with AAA; and Plaintiff counters that she worked in the "Field Business Conduct" division, which does not.

This Court gives undefined contract terms their plain, ordinary, and popular meanings, such as those found in dictionary definitions. *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 453 (7th Cir. 2012). A "division" is "an administrative or operating unit of a governmental, business, or educational organization." *Division*, The Merriam-Webster.com Dictionary, Merriam-Webster Inc., https://www.merriamwebster.com/dictionary/division (last accessed June 15, 2020).

Applying this definition, this Court finds that the record firmly supports Defendant's argument that Plaintiff worked in Defendant's personal lines "division." [161] at 19–20. Indeed, the undisputed evidence shows that Defendant maintains a number of business units, including "personal lines," "emerging businesses," and "Allstate Investments," each of which offers its own products and services, and is organized under its own leaders. [163] at ¶ 25. Between September 2016 and when she left the company in December 2016, Plaintiff served as Senior Vice President,

Field Business Conduct Officer. *Id.* at ¶ 28. In this role, Plaintiff reported directly to Kathy Mabe, who then reported to Matt Winter—the head of personal lines. *Id.* at ¶¶ 26, 28, 48; [163-20] at 3; [163-1] at 18–19.

Plaintiff testified that she defines "division" by reference to reporting structures, and ultimately the leader of a particular reporting structure. *E.g.*, [163-1] at 19 ("I defined [the term division] more based on probably leader."). Plaintiff acknowledged that she reported to Winter. *Id.* All of this evidence supports Defendant's position that personal lines constituted an operating unit—and hence "division"—within the company, and that Plaintiff worked for that "division."

Despite this evidence, Plaintiff disputes that "personal lines" constitutes a "division" of Defendant's business, positing that the term merely refers to a line of products Defendant offers. [185] at ¶¶ 27–28. She asserts instead that twenty "divisions" exist within personal lines, including the "Field Business Conduct division" to which she belonged. *Id.* at ¶ 27. Plaintiff points to the testimony of Harty, the company's former HR head, who testified that personal lines "divided into . . . other areas" such as "Field Business Conduct." [163-3] at 31. But Harty also testified that personal lines constituted one of the "major divisions" within the company. *Id.* at 26. Further, consistent with Harty's testimony, Defendant's organizational chart from 2016 reflects that "Field Business Conduct" exists within personal lines. [189] at ¶¶ 25–26; [200] at ¶¶ 25–26.

At most, Harty's testimony and Defendant's organizational chart merely help Plaintiff establish that she worked within a more granularly defined subdivision or

department of personal lines. Such evidence, of course, simply bolsters the conclusion that personal lines is the "division" at issue. And Plaintiff does not point to any other evidence—beyond her own say-so—suggesting that "Field Business Conduct" constitutes its own "division" at the company. She thus fails to raise a triable issue on this point.

Having established personal lines as the relevant "division" in which Plaintiff worked, AAA plainly constitutes a "competitive business." For instance, the undisputed record shows that Defendant's personal lines "division" sells automobile insurance, [163] at ¶ 27, as does AAA, *id.* at ¶ 37. AAA thus sells a product that competes with one of personal lines' products, rendering AAA a "competitive business" as defined by the Forfeiture Provision. [163-8] at 23 ("'Competitive Business' is defined as a business that designs, develops, markets, or sells a product, product line, or service that competes with any product, product line, or service of the division in which Participant works."). Accordingly, Defendant acted within its contractual right to cancel Plaintiff's unvested awards.

In short, Plaintiff fails to demonstrate that Defendant breached the EIP. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018) (setting forth the elements for breach of contract under Illinois law). For that reason, this Court grants summary judgment to Defendant on Count I.

## B. Count II: Breach of Contract (AIP)

In Count II, Plaintiff claims that Defendant breached the AIP by denying her a bonus for the 2016 year. [140] at ¶¶ 159–86. Defendant argues that the language

22

of the AIP guide forecloses Plaintiff's claim because it expressly disclaims the existence of enforceable contractual rights between the parties. [161] at 21.

The parties agree that Illinois law applies to this claim. [161] at 21–23; [187] at 15–19. Under Illinois law, a plaintiff fails to establish a contractual right to a bonus where the language of a bonus plan expressly disclaims the existence of a contract. *Tatom*, 305 F.3d at 743 (an "express disclaimer [of a contract] forecloses any reasonable expectation that [the plaintiff] had been promised a bonus."); *see also Curran v. JP Morgan Chase, N.A.*, 633 F. Supp. 2d 639, 645 (N.D. Ill. 2009) (dismissing breach of contract claim for alleged loss of a discretionary bonus where the "branch profitability incentive plan" specifically disclaimed the existence of contractual rights to the bonus); *In re Comdisco, Inc.*, No. 02 C 7030, 2003 WL 685645, at *4 (N.D. Ill. Feb. 27, 2003) (no contractual right to bonus where the plan document "only communicates the plan's provisions and that the plan should not be considered a contract."); *Moore v. Ill. Bell Tel. Co.*, 508 N.E.2d 519, 520–21 (Ill. App. Ct. 1987) (no enforceable contract created by incentive plan stating it "is a statement of management's intent and is not a contract or assurance of compensation.").

Here, the AIP guide states that "[a]ll awards, including pro-rata eligibility, are distributed on a discretionary basis," and "[n]o one, regardless of eligibility, is guaranteed an award." [163] at ¶ 17. The AIP further states that it "creates no contract, implied or otherwise between you, Allstate Insurance Company, and any of its affiliates. The final decision as to whether an award is paid to an eligible participant is solely at the discretion of Allstate." *Id.* at ¶ 19. As in the above cases,

the AIP expressly disclaims the existence of any contractual rights or obligations, thus foreclosing Plaintiff's claim for breach of contract. Accordingly, based upon the undisputed portions of the factual record, this Court grants summary judgment to Defendant on Count II.

### C.  Count III:  IWPCA

Plaintiff next asserts that Defendant violated the Illinois Wage Payment and Collection Act (IWPCA) by failing to pay her a 2016 bonus based upon the AIP.  [140] at ¶¶ 187–94.  The IWPCA requires an employer to pay the full amount of an employee's "final compensation" upon an employee's separation.  820 ILCS 115/5. The statute further defines "final compensation" as "wages, salaries, earned commissions, [and] *earned* bonuses . . . owed the employee by the employer pursuant to an *employment contract or agreement* between the 2 parties."  820 ILCS 115/2 (emphasis added).

Plaintiff's IWPCA claim fails for two reasons.  First, as discussed above, Plaintiff fails to establish that the AIP guide amounts to an agreement entitling her to a bonus.  Because the IWCPA only supplies a right of action based upon an "employment contract or agreement," *see id.*, this failure alone is fatal to Plaintiff's IWCPA claim, *see Stark v. PPM Am., Inc.*, 354 F.3d 666, 672 (7th Cir. 2004) (no IWCPA claim where no contract exists setting out the terms of a bonus); *In re Comdisco*, 2003 WL 685645, at *3 ("Unless appellants can establish that Comdisco is under a contractual obligation to pay the bonuses, the IWPCA has no application to this case.").

24

Second, the IWCPA applies only to "earned" bonuses, not discretionary or gratuitous bonuses. *Sutula-Johnson v. Office Depot, Inc.*, 893 F.3d 967, 975 (7th Cir. 2018). An employee possesses a right to an "earned bonus" where "there is an unequivocal promise by the employer" to that entitlement. *Hess v. Bresney*, 784 F.3d 1154, 1162 (7th Cir. 2015) (quoting 56 Ill. Admin. Code § 300.500 (2014)). In *Hess*, the Seventh Circuit rejected the plaintiff's argument that a compensation letter amounted to an "unequivocal promise" to a bonus because it stated only that plaintiff "will be eligible to receive" a bonus if he meets a certain revenue threshold. *Id.* The court reasoned that "[e]ligibility, of course, is no guarantee. Hess might very well be eligible for a bonus, but due to a host of factors, not receive one." *Id.*

Here, as in *Hess*, the AIP guide states that "[a]ll awards, including pro-rata eligibility, are distributed on a discretionary basis," and reiterates that "[n]o one, regardless of eligibility, is guaranteed an award." [163] at ¶ 17. In other words, although Plaintiff may have been eligible for a bonus, Defendant maintained full discretion to award—or refuse to award—any bonuses. Plaintiff therefore fails to establish her entitlement to an "earned bonus" under the IWCPA. *Hess*, 784 F.3d at 1162; *see also Lillien v. Peak6 Investments, L.P.*, 417 F.3d 667, 670 (7th Cir. 2005) (affirming summary judgment on IWCPA claim where an offer letter stated: "You will be eligible for a year-end discretionary bonus."). This Court grants summary judgment to Defendant on Count III.

###### D. Count IV: Unjust Enrichment

Finally, Plaintiff's claim for unjust enrichment based upon the AIP also fails as a matter of law. Under Illinois law, unjust enrichment "is not a separate cause of action but is a condition brought about by fraud or other unlawful conduct." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 735 (7th Cir. 2019); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011). Because no other standalone claim exists here, Plaintiff's unjust enrichment claim necessarily also fails. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019). This Court grants summary judgment to Defendant on Count IV.[2]

### IV. Conclusion

For the reasons explained above, this Court grants Defendant's motion for summary judgment [160]. The Clerk is directed to enter judgment for Defendant on all counts. All dates and deadlines are stricken. Civil case terminated.

Dated: November 20, 2020

Entered:

John Robert Blakey
United States District Judge

---

[2] Defendant also moved to dismiss Counts II, III, and IV pursuant to Rule 12(b)(6). [141]. Because this Court grants summary judgment to Defendant on these counts, it denies the motion to dismiss [141] as moot.